BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION:

IN RE: AQUEOUS FILM-FORMING FOAMS
PRODUCTS LIABILITY LITIGATION MDL 2873
Case No. 2:22-cv-4098-RMG

| | |
|---|---|
| FRANK CHRISTOPHER MORRIS, individually and on behalf of THE ESTATE OF FRANK WILFORD MORRIS, JR., Plaintiff, vs. <br><br> 3M COMPANY, E. I. DU PONT DE NEMOURS & CO., CORTEVA, INC., THE CHEMOURS COMPANY , DUPONT DE NEMOURS, INC; AGC CHEMICALS AMERICAS, INC., ALLSTAR FIRE EQUIPMENT, AMEREX CORPORATION, ARCHROMA U.S., INC., ARKEMA, INC., BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER  CORPORATION, CHEMGUARD, INC., CLARIANT CORPORATION, DAIKIN AMERICA, INC., DYNAX CORPORATION, FIRE SERVICE PLUS, INC., GLOBE MANUFACTURING COMPANY LLC, HONEYWELL SAFETY PRODUCTS USA, INC., JOHNSON CONTROLS, INC., KIDDE-FENWAL, INC., LION GROUP, INC., L.N. CURTIS & SONS, MALLORY SAFETY AND SUPPLY LLC, MINE SAFETY APPLIANCES COMPANY LLC, MORNING PRIDE MANUFACTURING D/B/A HONEYWELL FIRST RESPONDER PRODUCTS, MUNICIPAL EMERGENCY SERVICES INC., NATIONAL FOAM, INC., PBI PERFORMANCE PRODUCTS, INC., PERIMETER SOLUTIONS, LP, SPERIAN PROTECTIVE APPAREL, USA, LLC, STEDFAST USA, INC., TENCATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS INC., TYCO FIRE PRODUCTS, L.P., W. L. GORE & ASSOCIATES, INC., Defendants. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br><br> **DEMAND FOR JURY TRIAL** |

NOW COMES Plaintiff Frank Christopher Morris ("Chris Morris"), on behalf of the estate of Frank Wilford Morris, Jr. ("Frank Morris"), by and through undersigned counsel, alleges as follows:

## NATURE OF THE ACTION

1.     Frank W. Morris, Jr. ("Morris") retired in 2016 after 25 years of service as a firefighter with the Asheville Fire Department in Asheville, NC.  During his service as a firefighter Morris was diagnosed with and received treatment for thyroid disease and related conditions.  On November 29, 2019, Morris died after being diagnosed with acute myeloid leukemia.

2.     Plaintiff Chris Morris, Morris' son and executor of the Estate of Frank W. Morris, Jr. ("Estate"), brings this action on behalf of the Estate to recover damages and appropriate injunctive and equitable relief for harm Morris suffered as a result of exposure to toxic per- and polyfluoroalkyl substances (collectively, "PFAS") to which Morris was exposed throughout his career as a firefighter without his knowledge or consent.

3.     PFAS were manufactured, designed, sold, supplied, distributed and/or contained in products manufactured, designed, sold, supplied and/or distributed by Defendants, individually or through their predecessors or subsidiaries. Plaintiff contends that as a direct and proximate result of Morris's exposure to PFAS chemicals they manufactured and/or distributed, Defendants are liable for personal injuries, emotional distress, and eventual death of Morris,

4.     PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured end products to, *inter alia,* resist and repel oil, stains, heat, and water, and to resist corrosion. PFAS include "long-chain" PFAS made of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

5.    The human-made carbon-fluorine bonds that characterize PFAS chemicals do not exist in nature and are exceptionally strong. As detailed below, these toxic chemicals are present in firefighter uniforms, called turnout gear, and in Class B foam used for firefighting and training.

6.    Because PFAS can persist in the environment for 10,000 years or more, PFAS chemicals bioaccumulate and increase in concentration (biomagnify) up the food chain. Because PFAS do not readily degrade—and, when they do, tend to break down only into other PFAS— they are known as "forever chemicals."[1]  PFAS exposure to humans can occur through inhalation, ingestion, and dermal contact.[2]

7.    PFAS have been associated with multiple and serious adverse health effects in humans including cancer, liver damage, immunological and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, accelerated changes in gene expression, decreased fertility, pregnancy-induced hypertension, and other health conditions.[3] PFAS chemicals pose significant human health risks even at extremely low concentrations, and have also been shown to bioaccumulate in human blood, bones, and organs and to reduce the effectiveness of certain vaccines.[4]

8.    Unknown to Morris, Defendants have, either individually or through their predecessors or subsidiaries, knowingly and willfully manufactured, marketed, designed, sold,

---

[1] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited November 2, 2022), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

[2] Suzanne E. Fenton, MS, PhD, *PFAS Collection,* Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.Nov/curated-collect1ons/pfas.

[3] Koskela, A. et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats*, National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf.

[4] *Id*. (Koskela study); Tasha Stolber, *PFAS Chemicals Harm the Immune System, Decrease Response to Vaccines, New EWG Review Finds*, Environmental Working Group (November 12, 2020), https://www.ewg.org/news-and-analysis/2020/11/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg.

supplied, distributed, and/or used PFAS and PFAS-containing materials in protective clothing and uniforms specifically designed for firefighters ("turnout gear") as well as in Class B firefighting foams[5] for decades. These products were used by firefighters, firefighting training facilities, and fire departments globally, including in the State of North Carolina, who were unaware of their toxicity.

9.      Defendants have long been aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Nevertheless, Defendants manufactured, designed, marketed, sold, supplied, and/or distributed PFAS and PFAS chemical feedstock[6] as well as PFAS-containing turnout gear and Class B foam to firefighting training facilities and fire departments nationally, including the fire department in Asheville, North Carolina. Moreover, Defendants did so without ever informing firefighters or the public that the turnout gear and Class B foam contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS and PFAS-containing materials.

10.      Morris wore turnout gear and occasionally used Class B foam in the usual and normal course of performing his firefighting duties and training, which exposed him to PFAS. He did not know, and, in the exercise of reasonable diligence, could not have known, that these products contained PFAS or PFAS-containing materials, nor could he have known that his exposure to these materials could and would cause serious negative health impacts.

11.      At all relevant times and continuing to the present, Defendants represented their turnout gear and Class B foam as safe, even though they knew or should have known that

---

[5] Class B foams are synthetic, soap-like fluorosurfactant foams, the most common form of which is aqueous film-forming foam ("AFFF"), that spread rapidly across the surface of a fuel or chemical fire to stop the formation of flammable vapors.
[6] Chemical feedstock refers to a chemical used to support a large-scale chemical reaction. The PFAS chemicals utilized to manufacture products containing PFAS are generally referred to herein as "chemical feedstock."

firefighters would repeatedly inhale, ingest, and/or have dermal contact with these harmful chemical compounds.

12.     Morris's repeated and extensive exposure to PFAS through his routine and foreseeable use of turnout gear and occasional use of Class B foam caused or substantially contributed to Morris developing adverse health conditions including hypothyroidism and related symptoms, including depression, for which he received medical treatment until his eventual diagnosis and resulting death from leukemia and related complications.

13.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of North Carolina when they knew or reasonably should have known that Morris and other firefighters would repeatedly inhale, ingest and/or have dermal contact with these harmful compounds during the normal course of training and emergency response, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

14.     As a direct and proximate result of PFAS exposure, Morris suffered physical injury, related damages, and death, for which his Estate is entitled to actual, compensatory, and punitive damages.

**PARTIES TO THE ACTION**

15.     At the time of his death on November 29, 2019, Frank W. Morris, Jr. ("Morris") was a citizen and resident of Buncombe County, North Carolina.

16.     Chris Morris is a citizen and resident of Buncombe County, North Carolina and is the duly appointed and qualified Administrator of the Estate of Frank W. Morris, Jr.

17.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its

principal place of business located at 3M Center, St. Pau1, Minnesota 55144. On information and belief, 3M developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS-containing materials, and products containing PFAS in turnout gear and/or Class B foams in North Carolina. 3M does business throughout the United States and is registered to do business in North Carolina.

18.     Defendant E. I. du Pont de Nemours and Company (i.e., "Old DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Old DuPont has designed, manufactured, marketed, distributed, released, and sold fluorochemicals and/or fluorosurfactants containing perfluorooctanoic acid ("PFOA") and/or its precursors used to manufacture, market, distribute, release, and sell turnout gear and Class B foams, in North Carolina. Old DuPont does business throughout the United States, is registered to do business in North Carolina.

19.     Defendant DuPont de Nemours, Inc. (i.e., "New DuPont"), formerly known as DowDuPont Inc., is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with Old Dow and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities — including those relating to PFAS. New DuPont does business throughout the United States, including in North Carolina.

20.     Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road,

Wilmington, Delaware 19805. In 2018, New DuPont spun off a new, publicly-traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, on information and belief, Corteva assumed certain Old DuPont liabilities—including those relating to PFAS. Corteva does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

21.     Defendant The Chemours Company ("Chemours") is a is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19898. Upon information and belief, in 2015, after Old DuPont spun off Chemours, Old DuPont merged with Old Dow and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed certain Old DuPont liabilities—including those relating to PFAS. Chemours does business throughout the United States, including in North Carolina.

22.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 55 East Uwchlan Avenue, Suite 201 Exton, Pennsylvania 19341. AGC Chemicals is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass Co., Ltd.). On information and belief, AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. AGC does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina with the Secretary of State.

23.     Defendant AllStar Fire Equipment ("AllStar") is a corporation organized under the laws of the State of California, with its principal place of business located at 12328 Lower Azusa

Road, Arcadia, California 91006. On information and belief, AllStar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. AllStar does business throughout the United States, including in North Carolina.

24.     Defendant Amerex Corporation (a/k/a Alabama Amerex Corporation, "Amerex") is an Alabama corporation with its principal place of business located at 7595 Gadsden Highway, Trussville, Alabama 35173. On information and belief, Amerex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Amerex does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

25.     Defendant Archroma, U.S., Inc. ("Archroma") is a is a is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. On information and belief, Archroma developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Archroma does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina with the Secretary of State.

26.     Defendant Arkema, Inc. ("Arkema") is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 900 First Avenue, King of Prussia, Pennsylvania 19406. On information and belief, Arkema is a successor in interest to Atochem North America Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. On information and belief, Arkema developed, manufactured, marketed, distributed, released, sold,

and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Arkema does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

27.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086. On information and belief, Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Buckeye does business throughout the United States, and is registered to do business in North Carolina,

28.     Defendant Carrier Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On information and belief, Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Carrier does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

29.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Chemguard developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing

or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

30.     Defendant Clariant Corporation ("Clariant") is a corporation organized under the laws of the State of New York, with its principal place of business located at 500 E. Morehead Street, Suite 400, Charlotte, North Carolina 28202. On information and belief, Clariant developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Clariant does business throughout the United States and is registered to do business in North Carolina.

31.     Defendant Daikin America, Inc. ("Daikin America") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962. On information and belief, Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Daikin America does business throughout the United States, including in North Carolina.

32.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576. On information and belief, Dynax developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

33.    Defendant Fire Service Plus, Inc. ("FSP") is a corporation organized under the laws of the State of Georgia, with its principal place of business located at 473 Dividend Drive, Peachtree City, Georgia 30269. On information and belief, FSP developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnouts and/or Class B foams, including in North Carolina.

34.    Defendant Globe Manufacturing Company, LLC ("Globe") is a corporation organized under the laws of the State of New Hampshire, with its principal place of business located at 37 Loudon Road, Pittsfield, New Hampshire 03263. Defendant Mine Safety Appliances Company acquired Globe Holding Company, LLC and its subsidiaries in 2017 and continues to do business under the Globe name. On information and belief, Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnouts and/or Class B foams, including in North Carolina.

35.    Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 855 S Mint Street, Charlotte, North Carolina 28202. On information and belief, Honeywell and its affiliates, including Sperian Protection, developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Honeywell does business throughout the United States, including in North Carolina, and is registered to do business in North Carolina.

36.    Defendant Johnson Controls, Inc. ("Johnson Controls") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 5757 N Green Bay Avenue, Milwaukee, Wisconsin 53209. Johnson Controls is the parent of Defendants

Tyco Fire Products, LP and Chemguard, Inc. On information and belief, Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Johnson Controls does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

37.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). On information and belief, Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Kidde-Fenwal does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

38.    Defendant Lion Group, Inc. ("Lion") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 7200 Poe Avenue, Dayton, Ohio 45414. On information and belief, Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.

39.    Defendant L.N. Curtis & Sons ("LN Curtis") is a corporation organized under the laws of the State of California, with its principal place of business located at 185 Lennon Lane, Walnut Creek, California 94598. On information and belief, LN Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing

or used in the manufacture of PFAS in turnout gear, including in North Carolina. LN Curtis does business throughout the United States, including in North Carolina.

40.    Defendant Mallory Safety and Supply, LLC ("Mallory") is a corporation organized under the laws of the State of California, with its principal place of business located at 3241 NW Industrial Street, Portland, OR 97210. On information and belief, Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Mallory does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

41.    Defendant Mine Safety Appliances Company, LLC ("MSA") is a corporation organized under the laws of the State of Louisiana, with its principal place of business located at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania 16066. Mine Safety Appliances acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. On information and belief, MSA/Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. MSA does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

42.    Defendant Morning Pride Manufacturing, LLC d/b/a Honeywell First Responder Products ("Morning") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 1 Innovation Court, Dayton, OH 45414.  On information and belief, Morning developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear

and/or Class B foams, including in North Carolina. Morning does business throughout the United States, including, North Carolina.

43.     Defendant Municipal Emergency Services, Inc. ("Municipal") is a corporation organized under the laws of the State of Nevada, with its principal place of business located at 12 Turnberry Lane, Fl. 2, Sandy Hook, Connecticut 06482. On information and belief, Municipal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Municipal does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

44.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). On information and belief, National Foam/Angus Fire developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. National Foam does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina with the Secretary of State.

45.     Defendant PBI Performance Products, Inc. ("PBI") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 9800-D Southern Pine Boulevard, Charlotte, North Carolina 28273. On information and belief, PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including

in North Carolina. PBI does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

46.     Defendant Perimeter Solutions, LP ("Perimeter") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 63105. On information and belief, Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina. Perimeter does business throughout the United States, including in North Carolina.

47.     Defendant Sperian Protective Apparel, USA, LLC ("Sperian") is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business located at 1345 15th Street, Franklin, Pennsylvania 16323.  On information and belief, Sperian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear and/or Class B foams, including in North Carolina.  Sperian does business throughout the United States, including in North Carolina.

48.     Defendant StedFast USA, Inc. ("StedFast") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 800 Mountain View Drive, Piney Flats, Tennessee 37686. On information and belief, StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. StedFast does business throughout the United States, including in North Carolina.

49.    Defendant TenCate Protective Fabrics USA d/b/a/ Southern Mills, Inc. ("Tencate") is a corporation organized under the laws of the State of Georgia, with its principal place of business located at 6501 Mall Boulevard, Union City, Georgia 30291. On information and belief, Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout, including in North Carolina. Tencate does business throughout the United States, including in North Carolina.

50.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Tyco manufactures the Ansul brand of products and is the successor-in-interest to Ansul Company (collectively, "Tyco/Ansul"). On information and belief, Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFOA and/or its precursors that was transported, stored, used, handled, trained with, tested equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including at the Base. Tyco does business throughout the United States, including in North Carolina.

51.    Defendant W. L. Gore & Associates, Inc. ("Gore") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 555 Paper Mill Road, Newark, Delaware 19711. On information and belief, Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing or used in the manufacture of PFAS in turnout gear, including in North Carolina. Gore does business throughout the United States, including in North Carolina, and it is registered to do business in North Carolina.

52.     Each named Defendant derived substantial revenue from the PFAS, PFAS materials and/or chemical feedstock, and products containing PFAS in turnout gear and/or Class B foams that Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and/or sold within North Carolina, and that Frank Morris used in a reasonably foreseeable manner in the course of conducting his firefighter duties.

53.     Defendants expected or should have expected that their acts would have consequences related to Morris' use of turnout gear and foam within the State of North Carolina and Defendants derived substantial revenue from interstate commerce.

54.     Defendants purposefully availed themselves of the privilege of conducting business and activities within the State of North Carolina, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

55.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) and 1332(c)(1) in that there is complete diversity among the plaintiff and defendants and the amount in controversy exceeds $75,000.

56.     Plaintiff is filing this complaint as permitted by Case Management Order No. 3 (CMO#3) issued by Judge Richard M. Gergel of this Court.  Pursuant to CMO #3, plaintiff designates United States District Court for the Western District of North Carolina as "home venue" for this matter pursuant to 28 U.S.C. §1391.  But for CMO #3, venue is proper in the United States District Court for the Western District of North Carolina in that the events or omissions giving rise to the claim occurred in that District. Plaintiff respectfully requests that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the Western District of North Carolina.

57.     The United States District Court for the Western District of North Carolina has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the state of North Carolina for active use by users during the course of training and firefighting activities. Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Western District of North Carolina does not offend traditional notions of fair play and substantial justice.

## SUBSTANTIVE ALLEGATIONS

### I.     Plaintiff Morris' Use of and Exposure to PFAS-Containing Products

55.     Plaintiff re-alleges and incorporates by reference each of the above paragraphs of this Complaint as if fully set forth herein.

56.     Morris began work as a fire-fighter as part of one of the eleven hotshot crews working for the Bureau of Land Management ("BLM") mostly in western states. Each hotshot crew consists of 20 members, specially trained to fight forest fires in the most rugged terrain, and to assist in all-risk missions such as disaster relief.

57.     As a BLM hotshot, Morris regularly risked his life by going into the hottest-burning parts of wildfires, navigating difficult terrain with a heavy kit of equipment, and building fire lines to control the spread of the blaze.

58.     In 1991, after 8 years of working in wildlands fire service, Morris began working as a firefighter for the City of Asheville Fire Department, saving lives and homes, providing

emergency services and medical care, performing rescues, and offering support to people in trauma, among other duties.

59.    To prepare for this work, Morris received extensive and ongoing training in fire prevention, fire suppression including, but not limited to in the preparation and use of Class B foam, incident command, fire line construction, search and rescue, ventilation operations, salvage and overhaul, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

60.    During training, practice operations, and when responding to calls, Morris wore firefighting turnout gear treated and/or coated with one or more PFAS chemicals.

61.    Upon information and belief, the turn out gear used by firefighters at the Asheville Fire Department, including Morris, was manufactured and/or distributed by Defendants Sperian, and Morning.

62.    Morris' turnout gear included bunker pants, coat, suspenders, hood, gloves, boots, and a helmet.

63.    During training, Morris was exposed to one or more PFAS chemicals through deployment of Class B foam.

64.    Morris was unaware that the turnout gear he wore or the Class B foam used in training contained PFAS.

## II.    Detrimental and Fatal Health Impacts to Morris

65.    During his 25 years of service with the Asheville Fire Department, Morris was diagnosed and received treatment for several medical conditions now understood to be related to PFAS exposure.

66.     In 2002, at age 51, Morris was diagnosed with, and treated for hypothyroidism, and a number of associated conditions including depression. In 2003, he took three months of sick leave to try to cope and heal.

67.     Throughout the last 20 years of his life, Morris dealt with a variety of health conditions including hemochromatosis (iron overload), high cholesterol (hyperlipidemia), high blood sugar (hyperglycemia), depression, and insomnia, among others, as well as a number of bone and muscle injuries, for which he received regular medical treatment.

68.     In 2014, Morris' wife of 43 years was diagnosed with stage 4 pancreatic cancer and died in 2015.

69.     In January of 2016, Morris was diagnosed with an aortic aneurysm, and in April of that year, retired after 25 years of service to the Asheville Fire Department.

70.     In 2019, Morris experienced a marked acceleration of deleterious health issues.  In April, Morris sought evaluation and treatment for a lump in his throat that his doctors determined was caused by a persistent enlarged lymph node and acute inflammation of the salivary gland. In September and October, Morris experienced episodes of atrial fibrillation and underwent a series of tests and treatments.

71.     On November 17, 2019, Morris sought emergency medical care after experiencing severe chest pain and shortness of breath.

72.     Soon after admission, Doctors diagnosed Morris with acute myeloid leukemia, kidney failure, and acute kidney injury, the latter of which was suspected to be the result of a rare syndrome wherein massive number of malignant cells release their contents to the bloodstream without previous cancer treatment (spontaneous tumor lysis syndrome). Morris agreed to begin aggressive chemotherapy treatment the same day.

73.    Morris agreed to pursue a four to five-week hospital stay for aggressive treatment of his cancer, which the treating doctor suspected was career-related.  While in the hospital, Morris became quite agitated and was attempting to get out bed and leave, until he was put under arm restraint.

74.    On November 29, 2019, Morris suffered a heart attack, was put on life support and restraints removed, and died the same day of complications from acute myeloid leukemia.

### III.    Firefighter Exposure to PFAS

75.    Firefighters wear turnout gear to provide a degree of thermal, chemical, and biological protection. Turnout gear includes a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner to protect the firefighter from ambient heat.[7]

76.    PFAS chemicals are used in turnout gear to impart heat, water, and stain resistance to the outer shell of turnout gear as well as chemical, liquid, and bloodborne pathogen resistance to the moisture barrier.

77.    Due to exposure to heat, these PFAS off-gas, break down, and degrade into highly mobile and toxic particles and dust[8], allowing them to permeate the moisture-wicking, breathable inner thermal layer and cause substantial dermal contact to the firefighter.[9] Firefighters are also exposed through inhalation of off-gassed chemicals, accidental ingestion of the chemicals, and through normal workplace activities, as particles from their turnout gear spread to fire response vehicles and stations, the Class B foam used and firefighters' personal vehicles and homes.[10]

---

[7] *What Materials Go Into Making Turnout Gear?,* Globe MSA Safety Website, (last visited November 2, 2022), https://globe.msasafety.com/selecting-your-near/materials.
[8] A.S. Young et al., *Per- and Polyfiuoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology  (2021), https://doi.ore/10.1038/s41370-021-00288-7.
[9] *Id.*
[10] *Id.*



Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

78.     Workplace exposure to PFAS or PFAS-containing materials at toxic levels has been known for decades. As early as a July 31, 1980, Old<??> DuPont officials documented measures needed to prevent workplace exposure to PFOA, one of the more well-known PFAS, acknowledging that the chemicals could permeate all protective materials, with toxicity varying based on the exposure pathway.   The document acknowledged that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded, "continued exposure is not tolerable."[11]

79.     A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed, and sold in 2008, 2014, and 2017 by six turnout gear makers, including Defendants MSA (under the Globe name) and Lion, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Morris.[12]

---

[11] Robert Bilott, *Exposure* (2019), pp. 174-5.
[12] Graham F. Peaslee, et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles* pp. 594-599 (Environmental Science & Technology Letters (June 23, 2020)), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410?ref=pdf (hereinafter the "Notre Dame Turnout Study").

80.     Firefighters with the Asheville Fire Department, including Morris, wore turnout gear manufactured by Defendant Honeywell and its affiliate Sperian Protection in the ordinary course of performing their duties as the gear was intended to be used and in a foreseeable manner, which exposed Morris and others to significant levels of PFAS.

81.     Morris did not know and in the exercise of reasonable diligence could not have known that the turnout gear he wore and used contained PFAS or PFAS-containing materials, and similarly did not know nor could have known that he was routinely exposed to PFAS or PFAS-containing materials.

82.     The turnout gear worn or used by Morris did not and does not contain labels that indicate the gear contains PFAS, and similarly did not warn Morris of the health risks associated with exposure to PFAS.

83.     Additionally, PFAS-containing Class B foam is used routinely in firefighting training as well as in fire extinguishment and can result in firefighters being sprayed or entirely soaked with Class B foam, walking in and through Class B foam (which can reach thigh- or even waist-high depth), or kneeling in Class B foam during use. As a result, firefighters can be exposed to PFAS through skin contact, inhalation, or ingestion.

84.     As alleged herein, Morris was also exposed to Class B foam during his training with the Asheville Fire Department.

85.     Morris did not know and in the exercise of reasonable diligence could not have known that the Class B foam he was exposed to in training contained PFAS or PFAS-containing

materials, and similarly did not know nor could have known that he was exposed to PFAS or PFAS-containing materials in the Class B foam.

86.     These exposures to PFAS or PFAS-containing materials for over two decades more likely than not caused or contributed to Morris developing thyroid disease, cancer, and other health conditions described above.

## IV.     Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied and/or Sold Toxic PFAS and/or Products Containing PFAS

87.     Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in turnout gear and PFAS containing Class B foam, throughout the United States and in North Carolina.

88.     PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA") and selling it to other companies, including Old DuPont.

89.     By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this widespread use, PFAS had never been detected in nor were present in human blood or bodies.

90.     In the 1960s, Class B foam containing PFAS entered the global market and became the primary firefighting foam all over the world, with 3M as one of the largest manufacturers.

91.     In the 1970s, Defendants National Foam and Tyco began to manufacture, market, and sell Class B foam containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

92.     Founded in 1918, Defendant MSA (under the Globe name) began manufacturing, marketing, and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant

fabric in 1966. MSA (under the Globe name) continues to manufacture, market, and sell turnout

gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[13]

93.     Defendant Lion began to manufacture, market, and sell turnout gear in 1970. Since

its founding, and continuing through to the present, Lion makes, markets, and sells turnout gear

using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied

by Defendant Chemours (a spin-off from Old DuPont), DuPont's NOMEX® PFAS-containing

flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[14]

## V.    Defendants Knew And Have Known That Exposure to PFAS Causes Serious Health Impacts

94.     Defendants have long known about the serious and significant impacts to health

caused by exposure to PFAS. Defendants 3M and Old DuPont (and associated spin-offs and

subsidiaries, namely Defendants New DuPont, Corteva, and Chemours) conducted multiple

studies on the exposure of the health effects of PFAS on animals, and in some cases, even on their

own employees. The findings of these studies were discussed internally but were not reported to

the public or to regulatory agencies.

95.     Those internal 3M and Old DuPont findings include:

a.    A 1950 3M study showed that PFAS could build up in the blood of mice and could
       bind to proteins in human blood, suggesting that PFAS would not only remain, but
       persist and accumulate, in the body of the exposed individuals with each additional
       exposure.[15]

---

[13] *See Globe History,* Globe MSA Safety Website, (last visited November 2, 2022),
https://globe.msasafety.com/history; *Turnout Gear Materials,* Globe MSA Safety Website, (last visited November 2,
2022),  https://globe.msasafety.com/materials.
[14] *See Our History,* Lion Website (last visited November 2, 2022), http://www.lionprotects.com/lion-histow;
*Firefighter Turnouts,* Lion Website (last visited November 2, 2022), https://www.lionprotects.com/firefighter-
turnout-gear.
[15] Timeline – *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public,*
Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-
Timeline_sm.pdf; *see also,* https://www.ewg.org/pfastimeline/.

b.  In 1961, a toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were duplicated in studies with dogs.

c.  In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."

d.  In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish involved in the experiment died.

e.  In the 1970s, Old DuPont discovered that there were high concentrations of PFOA in the blood samples of workers at DuPont's Washington Works site.

f.  By the end of the 1970s, studies performed by 3M indicated that PFOA was "completely resistant to biodegradation."[16]

g.  In 1981, 3M, which still supplied PFOA to Old DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to Old DuPont. Old DuPont then tested the children of pregnant employees in their Teflon divisions and found that of seven births between 1979 and 1981, two children had eye defects. Defendants reassigned 51 female employees but did not inform EPA or make this information public.

h.  In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M had represented.[17] Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable," but the company continued to sell them."[18]

i.  By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and Old DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant Old DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

j.  In the 1990s, Defendant Old DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

---

[16] *PFCS: Global Contaminants: PFCs Last Forever,* Environmental Working Group, (last visited November 10, 2022), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

[17] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.8 https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

[18] *Id.*

k. In response to the alarming and detrimental human health impacts, DuPont began to develop an alternative to PFOA. In 1993, DuPont circulated an internal memo announcing that "for the first time, we have a viable candidate" that appeared to be less toxic and with less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[19]

l. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[20]

96.     These decades of research and internal studies show that Defendants, including 3M and DuPont (all iterations) in particular, knew of the harmful impacts of PFAS chemicals both to the environment and humans, yet continued to manufacture, develop, market, distribute, supply and/or sell products contaminated with PFAS chemicals.

97.     Additionally, these studies by Defendants, including by 3M and Old DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bioaccumulation, and linked increased incidence of liver damage, various cancers, and birth defects in humans to PFAS exposure.

98.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process, or distribute chemicals to immediately report to the U.S. Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, the public, its customers, or end users like firefighter Morris of the health impacts resulting from exposure to PFAS.

99.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, as well as Class B foam, on the same day the EPA announced that PFOA and

---

[19] *Id., p.47.*
[20] Internal Old DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[21]

100.    However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. Further, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS.

101.    By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

102.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

103.    As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, the plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . .The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. ***This would include facilitating the publication of papers and articles***

---

[21] *EPA and 3M Announce Phase Out of PFOS,* Press Release, United States EPA (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

*dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm*. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[22]

104.    Class B foam manufacturers and distributors adopted a similarly aggressive industry campaign to evade government oversight and public attention to the risks posed by their products. In March 2001, 3M informed attendees at National Fire Protection Association's Technical Meeting on Foam, including Class B foam manufacturer Defendants Tyco, Chemguard and National Foam, that that 3M had discontinued its Class B foam business, citing concerns about the "proven pervasiveness, persistence and toxicity" of PFOS.

105.    Rather than acknowledging the toxicity of its product, Defendants continued to produce Class B foams containing PFAS and continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

106.    In 2005, the EPA fined Old DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA.[23] Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with Old DuPont and with Defendant Gore to develop, manufacture, market, distribute and sell turnout gear made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[24]

---

[22] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

[23] Michael Janofsky, DuPont to Pay $16.5 Million for Unreported Risks, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-millionLion-for-unreported-risks.html.

[24] *DuPont and Lion Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and Lion (January 30, 2013),
https://www.prweb.com/releases/dupont_protection_tech/lion_turnout_gear/prweb10362363.htm; *Our Partners*, Globe Website (last visited November 2, 2022), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection,* DuPont Website (last visited November 2, 2022),
https://www.dupont.com/personal-protection/firefighter-protection.html.

107.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin, to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[25]

108.    By this time, Defendants had begun to aggressively market, and distribute short-chain PFAS, such as GenX, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But these claims, too, were false. And known by Defendants to be so. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[26]

109.    "C8" is a name given to PFOA because it has eight carbon atoms, In 2011, the C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case began releasing its findings.[27] The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol, and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

110.    In 2013, Old DuPont entered an agreement with the EPA to cease production and use of PFOA – just one of *thousands* of PFAS chemicals the company makes, promotes, and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock,

---

[25] *PFOA Stewardship Program*, United States EPA (last visited November 2, 2022), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

[26] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

[27] *See generally, C8 Science Panel,* http://www.c8sciencepanel.org/panel.html (last visited November 14, 2022).

and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[28]

111.    In 2015, Old DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, Old DuPont required Chemours to indemnify New DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold New DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[29]

112.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the U.S. Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, [and] are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[30]

113.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the New DuPont (what was left of Old DuPont after spinning off Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew

---

[28] *See* Tom Neltner, http://blogs.edf.org/health/2019/02/20/potential-biopersistence- short-chain-pfas/.
[29] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.27 https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.
[30] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases,* Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet- ucs-2018.pdf.

nothing about Old DuPont's efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from Old DuPont's PFAS operations were now Chemours' problem.[31]

114.    In October 2021, EPA updated its 2018 assessment of the short-chain PFAS chemical known as GenX, finding that two Chemours GenX chemicals are ***more toxic*** than PFOA—the highly toxic long-chain PFAS they were developed to replace.[32]

115.    To date, there is no safe, acceptable, or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are *thousands* of PFAS chemicals – including precursor PFAS which degrade into PFOA and PFOS.[33]

## VI.    Defendants Failed to Warn Morris of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe

116.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bio-accumulating with a very long half-life. They knew that exposure to PFAS can cause serious and life- threatening diseases, including cancer.

117.    Yet, Defendants ***did not warn*** firefighter Morris or any other firefighter that PFAS and PFAS-containing products, including turnout gear or Class B foams used by Morris contained

---

[31] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II,* Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), p.28, 32.
https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.
[32] Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA*, Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistent- pollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40.
[33] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), United States EPA, (Nov. 2017), https://www.epa.gov/sites/production/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

PFAS, or that exposure to PFAS in the normal and intended use of such products causes serious bodily harm and illnesses, including cancer.

118.    Instead, Defendants have falsely represented—and continue to falsely represent—that PFAS and PFAS-containing turn out gear and foam are safe and not harmful to humans or the environment.

119.    Such assertions fly in the face of science and a global acknowledgement of the imperative of eliminating this class of chemicals from consumer products. In 2020, Congress passed legislation to address PFAS in turnout gear and foam,[34] and numerous states have severely restricted and/or banned PFAS-containing firefighting foam. For example, California will require sellers of turnout gear to notify purchasers if the product contains PFAS, while Colorado has banned PFAS-containing turnout gear as of 2022.[35] The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[36] And private companies like Home Depot, Lowes, and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g. Columbia and Marmot), clothing retailers (e.g. H&M, Levi Strauss & Co), shoe companies (e.g. Adidas and New Balance), car seat manufacturers (e.g. Britax and Graco),

---

[34] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters,* Fire Rescue 1, (December 17, 2020), https://www.firerescue1.com/legislation- funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters- Sp8MFif5dAbD4ZrI/.

[35] Andrew Wallender, *Toxic Firefighting Foam With PFAS Scrutinized by Multiple States*, Bloomberg Law (June 18, 2020), https://news.bloomberglaw.com/pfas-project/toxic-firefighting-foam-with-pfas-scrutinized-by-multiple-states; Cheryl Hogue, *California Bans PFAS Firefighting Foams*, Chemical & Engineering News (October 1, 2020), https://cen.acs.org/environment/persistent-pollutants/California-bans-PFAS-firefighting-foams/98/i38#:~:text=California%20is%20halting%20the%20sale,US%20market%20to%20do%20so; Marianne Goodland, *While Dozens of Bills Are Getting Axed, A Bill on Firefighting Chemicals Sails On*, Colorado Politics (May 28, 2020), https://www.coloradopolitics.com/legislature/while-dozens-of-bills-are-getting-axed-a-bill-on-firefighting-chemicals-sails-on/article_1b1e05f2-a11e-11ea-a270-230a36e06594.html; *Legislature Takes Strongest Stand Yet to Phase out PFAS in Firefighting Foam*, Washington State Council of Fire Fighters (March 5, 2020), https://www.wscff.org/legislature-takes-strongest- stand-yet-to-phase-out-pfas-in-firefighting-foam/.

[36] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging*, U.S. Food and Drug Administration, July 31, 2020, https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging.

furniture companies (e.g. IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[37] Most recently, on June 15, 2022, the U.S. EPA issued a Health Advisory setting a new interim lifetime exposure limit for perfluorooctane sulfonic acid (PFOS) and perfluorooctanoic acid (PFOA) in drinking water at 0.02, 0.004 parts per trillion (ppt) respectively, and final health advisories for perfluorobutane sulfonic acid (PFBS) and hexafluoropropylene oxide dimer acids and its ammonium salts (GenX) in drinking water at 2,000 and 10 parts per trillion (ppt) respectively.[38]

**A.      Defendants Provide No Accurate Safety Warnings**

120.    Plaintiff alleges that, in spite of the available science, neither the packaging on the PFAS-containing foam nor on the turnout gear sold by Defendants in North Carolina contain any warning that the turnout gear or Class B foam contains PFAS. Nor did the packaging or product have any warning that handling or using the gear or foam *as it was intended* can result in exposure to PFAS and serious bodily harm.

121.    Representative photos of labels on turnout gear used by the Asheville Fire Department are included below:

---

[37] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies*, Environmental Defense (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes- staples-protect-customers-toxics/; *PFAS-Free Products*, PFAS Central, (last visited November 2, 2022), https://pfascentral.org/pfas-free-products/.
[38] *Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances (PFAS)*, U.S. EPA, June 15, 2022, https://www.epa.gov/system/files/documents/2022-06/prepublication-four-pfas-june-2022.pdf.





122.    A Material Safety Data Sheet (or "MSDS") is a document that provides health and safety information about products, substances, or chemicals that are classified as hazardous substances or dangerous goods.

123.    Plaintiff alleges that no MSDS has been prepared for the turnout gear manufactured and distributed by Defendants.

124.    The MSDS provided with Defendants' Class B foams did not – and to this day does not – state that these foams contain PFAS or PFAS-containing materials; that PFAS is persistent, toxic, and bioaccumulating; or that PFAS exposure causes serious bodily harm. To the contrary, the MSDS falsely stated that the Class B foams and/or their contents are not known carcinogens and do not cause birth defects.

125.    Even now, the MSDS do not reflect the known serious health risks and hazards associated with exposure to PFAS in these Class B foams. For example, a MSDS issued on August 21, 2019 by Defendant National Foam for AFFF stated the product *was not carcinogenic or toxic*—contrary to decades of science.[39]

**B.    Defendants' Misrepresentations About PFAS Continue**

126.    Despite decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS or Class B foams and turnout gear made with or containing PFAS.

127.    Defendants' misinformation campaign is longstanding and continues to this day. Some pertinent examples include:

---

[39] National Foam Safety Data Sheet for Centurion (TMC6) 6% Aqueous Film Forming Foam Concentrate (AFFF) (May 19, 2021) https://nationalfoam.com/wp- content/uploads/sites/4/NMS340_Centurion-6-AFFF-Concentrate_052192021.pdf.

a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turnout gear is not treated or made with PFOS or PFOA: "PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile." He acknowledged that turnout gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. ***However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.*"** (Emphasis added).[40]

b. 2018 – The National Fire Protection Association (which maintains committees on foams and turnout gear that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnout gear for protection resulting from combustion or spills and cleaning turnout gear after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnout gear containing PFAS or PFAS-containing materials.[41]

c. 2019 - Defendant Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

d. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she ***absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure*."** (emphasis added)[42]

e. 2019 - Defendant Dynax founder Eduard Kleiner stated that C6-based surfactants [short-chain PFAS] do not bioaccumulate.[43]

---

[40] Letter from Lion president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch (October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc- 971b-caa9c2855800.pdf.

[41] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://community.nfpa.org/community/nfpa-today/blog/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc.

[42] Gabe Schneider, *3M Grilled over PFAS Chemicals at Congressional Hearing*, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.

[43] Marc S. Reisch, *What Is the Price of Fire Safety?*, Chemical & Engineering News (January 14, 2019), https://cen.acs.org/business/specialty-chemicals/price-fire-safety/97/i2?ref=search_results.

f. 2019 - Defendant Gore issued a public statement, stating that "the potential exposures and associated risks of cancer effects from PFOA alternative and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."[44]

g. 2020 - FluoroCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in Class B foam and turnout gear do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.[45]

h. 2020 - Defendant Lion-hired consultant Paul Chrostowski, PhD took out a full-page ad in *Firefighter Nation* to argue that turnout gear is completely safe and any evidence to the contrary, including the Notre Dame study, is unreliable and fearmongering. "[E]ven if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters' bodies in amounts that would be higher than the general population.... the connection between PFAS and cancer is extremely weak. The few peer- reviewed epidemiological studies that have found an association were not statistically significant and inconsistent with other studies.... The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer- causing toxic chemicals present on the fireground, as well as metabolic heat stress....Alternative materials tried by the U.S. fire service thus far have proven to be unsafe."[46]

i. 2020 - Defendant Lion through its hired consultant Chrostowski also stated in *Firefighter Nation* that all turnout gear is compliant with the standards set by the National Fire Protection Association ("NFPA") and Swiss organization OEKO-TEX's Standard 100 for PPE and Materials for PPE. "The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA."[47]

j. 2021 - In a New York Times article, Defendant W.L. Gore maintained that its turnout products were safe.[48]

---

[44] W. L. Gore and Associates, *Exposure Assessment and Cancer Risk Characterization for Firefighters from Non-Polymeric PFAS Residuals in Gore Components Used in Firefighting Gear*, (August 20, 2019), https://www.goretexprofessional.com/sites/tof/files/pdfs/Firefighter%20Exposure%20Assessment%20Short%20Chain%20Non%20Polymer%20Residual.pdf.

[45] *An Important Update About FluoroCouncil*, FluoroCouncil, Global Industry Council for Fluoro Technology (https://portal.ct.gov/DEEP/Remediation--Site-Clean-Up/PFAS-Task-Force/Pollution-Prevention-Committee - *see "Resources"* -- Fluorocouncil PFAS Information (August 23, 2019).

[46] Paul Chrostowski, Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims (June 3, 2020), https://www.firefighternation.com/health-safety/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/#gref.

[47] *Id.*

[48] Hiroko Tabuchi, Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic, New York Times, (January 26, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

k.  2021 - Defendant Lion stated that the representations articulated by its consultant Paul Chrostowski in 2020 reflect its position: "Dr. Chrostowski's report says it all for Lion."[49]

l.  2021 - Defendants MSA Globe and W. L. Gore have continued to state that their products have been tested and are safe.[50]

m.  2022 - Defendant 3M stated that it was not "necessary or appropriate" to declare any PFAS hazardous.[51] It also states on its website that: "The weight of scientific evidence from decades of research does not show that PFOS or PFOA causes harm in people at current or past levels....Decades of research into the health of these workers has not identified negative health outcomes caused by exposure to PFOA or PFOS....It is important to know that while some studies may find links or associations with possible health outcomes, this is not the same as causation. The weight of scientific evidence does not show that PFOS or PFOA causes harm to people at current or historical levels. Although PFAS have been detected in the environment at extremely low levels, their mere presence does not mean they are harmful.... Although it has been widely reported that no causal connection has been identified between exposure to PFOS or PFOA and harm to people's health, there is a great deal of misinformation in the public domain.... The findings of the C-8 science panel are also frequently misunderstood."[52]

n.  2022 - DuPont and Chemours also continue to assert that there is little scientific evidence to support that PFAS and/or certain PFAS, like fluoropolymers, are harmful to human health.[53]

o.  2022 - DuPont maintains that turnout gear keeps firefighters safe and "protect(s) against the intrusion of...chemicals."[54]

---

[49] David Ferry, The Toxic Job of Being A Hero, Men's Health, (September 21, 2021), https://www.menshealth.com/health/a37624731/cancer-firefighter-gear-pfas/.

[50] Andrew Wallender, Firefighters Want Halt on Money From Makers of PFAS-Laden Gear, Bloomberg Law, (January 19, 2021), https://news.bloomberglaw.com/pfas-project/firefighters-want-halt-on-money-from-makers-of-pfas-laden-gear.

[51] Jim Spencer, 3M's Support for PFAS Could Cost Taxpayers Billions of Dollars, Star Tribune (September 11, 2021), https://www.startribune.com/3m-s-support-for-pfas-could-cost-taxpayers-billion-of-dollars/600096094/.

[52] 3M website, PFAS Stewardship – Health Science (last visited November 3, 2022), https://www.3m.com/3M/en_US/pfas-stewardship-us/health-science/.

[53] DuPont website, Information on PFAS (last visited November 3, 2022), https://www.pp.dupont.com/pfas/what-governmental-agencies-say.html; Chemours website, Our Commitment to PFAS Stewardship (last visited November 3, 2022), https://www.chemours.com/en/corporate-responsibility/sustainability-safety/our-commitment-to-pfas-stewardship.

[54] Id. at DuPont website (last visited November 3, 2022), https://www.pp.dupont.com/knowledge/dupont-technology-in-your-turnout-gear.html.

128.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

129.    For example, in 2017, the International Association of Fire Fighters ("IAFF") issued a statement that both mischaracterizes and purports to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnout gear and Class B foam are minimal to non-existent.[55] The statement even encourages firefighters to continue to use legacy gear and foams, creating a false sense that these PFAS-containing foams and turnout gear are safe. The statement reads, in relevant part:

> PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.[56]

130.    The IAFF maintained the Defendants' position that the turnout gear and Class B foam was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, firefighters like Morris did not know and, in the exercise of reasonable diligence, could not have known that the turnout gear and Class B foam they used contained PFAS or PFAS-containing materials.

---

[55] The IAFF maintained this position until January 2021 when IAFF members demanded that the IAFF leadership hold turnout and Class B foam manufacturers accountable. In July 2021, new IAFF President Edward Kelley made clear that the cancer rates of firefighters is unacceptable and that IAFF is actively working to rid the fire service of the toxic PFAS found in firefighting foams and turnout gear. "The data is becoming clearer. The gear that's supposed to be protecting us is poisoning us. It defies logic. IAFF, Address by IAFF General President Edward Kelly, Facebook (July 16, 2021), https://www.facebook.com/IAFFonline/videos/180233720677454.

[56] International Association of Firefighters, Statement on PFOA and Turnout Gear (May 2017), https://tinyurl.com/y29mfh69.

131.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging the significant harm their PFAS chemicals have caused to human health and the environment.

132.    Because of these and other false claims and misrepresentations on the part of Defendants, firefighters like Morris did not know and, in the exercise of reasonable diligence, could not have known that the turnout gear and Class B foam used contained PFAS or PFAS-containing materials, and therefore caused Morris to be exposed to PFAS and/or PFAS-containing materials that cause cancers and other serious illnesses as a result of such exposure.

## VI.    Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnout Gear—But Defendants Continue to Discount or Deny These Risks

133.    While historical research centered on environmental impacts and exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to PFAS-containing turnout gear and Class B foam.

134.    In October 2019, for example, an expert panel of the International Pollutants Elimination Network (IPEN), an international non-profit organization comprised of over 600 public interest nongovernmental organizations dedicated to improving global chemical waste policies, published a scientific paper that explains: "[f]irefighters can be significantly exposed to PFHxS and other PFAS from firefighting foam via various occupational mechanisms including direct exposure during use as well as exposure from contaminated personal protective equipment (PPE), handling of contaminated equipment, managing PFAS foam wastes, occupation of

contaminated fire stations and consumption of contaminated local water and produce."[57] The panel concluded that "[o]ngoing exposure to PFHxS, PFOS and other PFAS amongst firefighters remains a major occupational health issue," noting that "[b]io- accumulation and very slow bio-elimination may be very significant influencing factors in PFHxS exposure" in firefighters.[58] "Of greater concern," the panel observed, "is that firefighter blood levels for PFOS and PFHxS are many times higher than the median values for the general...population."[59]

135.    In June 2020, scientists at the University of Notre Dame published a groundbreaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA (Globe) and LION, over several production years, as listed below:[60]

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL), | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

136.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form

---

[57] *Id.* at p. 25.
[58] *Id.*
[59] *Id.*
[60] Notre Dame Turnout Study, *supra* note 12.

of side-chain fluoropolymers."[61] According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[62] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[63] These findings are summarized in the table below:

**Environmental Science & Technology Letters**   pubs.acs.org/journal/estlcu   Letter

**Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC−MS/MS Analysis**

| values in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 10.6 | 139 | 615 | 21.5 | 20.5 | 991 |
| PFPeA | <MDL | 12.6 | 17.8 | 228 | 104 | 164 | 18.1 | 2.49 |
| PFHxA | <MDL | 30.5 | 36.9 | 199 | 28.6 | 10.9 | 35.8 | 36.9 |
| PFHpA | <MDL | 12.4 | 25.4 | 105 | 5.82 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 25.9 | <MDL |
| PFBS | 283 | 140 | 142 | 53 400 | 47 900 | 1050 | 230 | 90 400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 12.9 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 11.1 | <MDL | <MDL | <MDL | <MDL |

137.    [G]arment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[64] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely

---

[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*

by handling the turnout gear. This finding poses a health exposure concern not only for firefighters that rely on turnout gear to protect them from heat, fire, water, and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnout gear as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnout gear contain "the most highly fluorinated textiles I've ever seen"[65] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[66]

138.    Defendants have been quick to mischaracterize, dismiss, or downplay the significance of the Notre Dame Turnout Study. Defendant MSA (Globe), when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for merely responded: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[67]

139.    Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[68]

---

[65] Raleigh McElvery, Protective Gear Could Expose Firefighters to PFAS, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[66] Andrew Wallender, Firefighters Face New Possible Risk From Toxic PFAS: Their Gear, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[67] Blair Miller, Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear, Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/925236612/.

[68] Lion Customer Safety Alert – PFOA and Turnout Gear (April 24, 2019), https://cdn2.hubspot.net/hubfs/3475623/LION_PFOA_factsheet_042419.pdf.

140.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnout gear.[69] It does not, however, address that the maker's turnout gear in fact contain other PFAS chemicals, some of which break down into PFOA or PFOS, nor does it warn firefighters or the public about health harms associated with exposure to these toxic, bioaccumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**
PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

141.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a *Fire Rescue* magazine article about the study,[70] Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products."[71]

142.    And yet, Lion has admitted publicly that dermal absorption is a pathway of exposure to cancer-causing chemicals for firefighters. In Lion's *Not in Our House* cancer

---

[69] *Id.*
[70] Larissa Conroy, What If I Told You That Your Bunker Gear Was Causing Cancer?, Fire Rescue (May 28, 2020), https://www.firefighternation.com/firerescue/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref.
[71] Paul Chrostowski, Ph.D., QEP, Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims, Fire Rescue (June 3, 2020). https://firerescuemagazine.firefighternation.com/2020/06/03/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/-gref.

awareness fact sheet that currently appears on the company's website as of the date of this filing,

Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more

absorbent. The hotter you are, the more carcinogens your skin absorbs.[72] This statistic is

alarming given that the core body temperature of firefighters routinely increases during

firefighting activities while wearing turnout gear which contain known carcinogens.[73]

143.    Likewise, Defendant Honeywell has stated: "The skin on the neck is very thin and

prone to absorbing carcinogenic particulates."[74]

144.    A recent Harvard study examining PFAS levels in fire stations dust found that "dust

in turnout gear locker areas and adjoining apparatus bays had significantly higher fluorine

concentrations compared to living rooms in fire stations."[75]

145.    For years, the IAFF has held a yearly cancer summit and, until 2021, had done little

to address the PFAS in turnout gear.[76] Defendants, including at least DuPont, Gore, Lion, and

---

[72] Lion website,
https://cdn2.hubspot.net/hubfs/3475623/NOT%20IN%20OUR%20HOUSE%20Tip%20Sheet_Infographic%20(02-02-19).pdf (last visited November 3, 2022).
[73] Nancy Espinoza, Can We Stand the Heat?, Journal of Emergency Medical Services, (April 30, 2008), https://www.jems.com/operations/can-we-stand-heat-study-reveal/; Gavin P. Horn, et al., Thermal Response to Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and Suppression Tactic, Ergonomics (July 31, 2017), https://tinyurl.com/4j2mz7f7.
[74] Ronnie Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.
[75] Anna S. Young et al., Per- and polyfluoroalkyl substances (PFAS) and total fluorine in fire station dust, Journal of Exposure Science & Environmental Epidemiology (February 5, 2021), https://www.nature.com/articles/s41370-021-00288-7.
[76] As alleged above, IAFF has only recently begun to take action related to PFAS exposure due to pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related firefighter safety resolutions passed with the support of 99% of the membership. The resolutions require IAFF to: (1) sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout gear. Andrew Wallender, PFAS Resolutions Overwhelmingly Approved by Firefighters' Union, Bloomberg Law (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited September 30, 2021), https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

MSA (Globe) have been regular sponsors of the IAFF Cancer Summit. At this event, as well as in firefighter cancer-related publications, programs, and events, Defendants have repeatedly pushed the narrative that the high rate of cancer among firefighters is attributable either to other chemicals encountered in the line of duty or to firefighters' failure to wash their turnout gear after every call. Not once have Defendants admitted that the PFAS materials contained in their products has been found to be carcinogenic, or that the very equipment that should be protecting firefighters is causing the most harm.



146.    Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters themselves to make a pledge to protect themselves from carcinogens linked to cancer* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may

lead to cancer...") ***all the while refusing to take any corporate responsibility*** for continually exposing firefighters to carcinogens in their protective gear.[77]



---

[77] Rachel Zoch, Take A Pledge To Stop Cancer At the Door, Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-a-pledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/.

## VII.    Safer Firefighting Turnout Gear Is Technologically and Economically Feasible

147.    Defendants have long known that safer, reasonable, alternative designs exist that are not only technologically achievable, but also economically feasible. Indeed, given the enormous costs of remediation of the environment and of defensive litigation, not to mention the cost of human lives, implementing safe, feasible alternatives would have cost significantly less.

148.    Safe fluorine-free turnout gear was and is technologically and economically feasible.

149.    FIRE-DEX manufactures, markets, and sells an entire line of PFAS-free turnout gear, as well as non-fluorinated fabrics from Safety Components with a PFAS-free water-repellent.[78] "Made with the same fabric as our traditional TECGEN71 outer shell, this material is designed to reduce heat stress while offering the same performance levels in TPP, breathability, and overall reduction of composite weight."[79] Further, because of the increased breathability and thermal protection, the PFAS-free gear is the only outer shell that can currently be paired with the lightest and thinnest thermal liners and moisture barriers.[80] This, according to Fire-Dex, significantly reduces heat stress and cardiac failure for firefighters while also reducing the risk of cancer and other diseases by eliminating PFAS exposure though turnout gear.

150.    Defendants MSA/Globe, Honeywell, Tencate, and Gore have developed, manufactured, marketed, and/or sold PFAS-free waterproofing technology, PFAS-free outer shells in turnout gear and/or durable PFAS-free fabrics.[81]

---

[78] Fire-Dex Launches Non-Fluorinated PPE Fabrics, Firehouse.com (February 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/firedex-firedex-launches-nonfluorinated-ppe-fabrics.
[79] Alternative PPE, Fire-Dex website, (last visited November 2, 2022), https://www.firedex.com/catalog/tecgen51-fatigues/#materials.
[80] TecGen71 Outer Shell, Fire-Dex website, (last visited November 2, 2022) https://www.firedex.com/tecgen71/.
[81] FreeFAS Durable Water Repellent (DWR) Coating, MSA/Globe website (last visited November 3, 2022), https://globe.msasafety.com/newoutershells; Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17,

151.    Defendant Honeywell even admitted that these PFAS-free alternatives are safe, feasible, and economical: "Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way. The color fastness and wear remain the same."[82]

152.    While the technology to develop fluorine-free turnout gear has been available for years, the NFPA turnout gear standards-setting technical committee continues to adhere to certain guidelines for turnout gear which require PFAS – knowingly putting firefighters at risk for exposure to PFAS. This committee is comprised of industry consultants and textile and gear manufacturers, including Defendants MSA/Globe, Lion, Tyco, and Honeywell.[83]

153.    The economic and technological feasibility of fluorine-free foams and turnout gear is well-established and based on technology that has been available for years. The alternative designs detailed above are far safer for firefighters and eliminate the serious health risks that result from PFAS exposure.

154.    The only barrier to producing safer alternatives to PFAS-containing foams and turnout gear has been Defendants' opposition. Their continued manufacturing, marketing, selling and/or distributing PFAS-containing turnout gear and foam has exposed firefighters, including Morris, to toxic PFAS chemicals. These defective designs were a substantial factor in causing Morris's injuries and death.

---

2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear; WL Gore to Release PFAS-free Waterproof Material for Apparel, Chemical Watch (October 4, 2021), https://chemicalwatch.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.
[82] Wendt, Innovations in Turnout Gear, Industrial Fire World (March 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.
[83] NFPA 1971/1851 Technical Committee Meeting Minutes (March 31, 2020), https://www.nfpa.org/assets/files/AboutTheCodes/1971/1971_F2022_FAE_SPF_Pre-FD_MeetingMinutes_3_20.pdf; NFPA 1971/1851 Technical Committee Meeting Minutes (January 11-12, 2012), https://www.nfpa.org/assets/files/aboutthecodes/1851/fae-spf_pre-rocmeetingminutes_01-12%20(2).pdf.

155.    Based on all of the foregoing, Plaintiff brings this action for damages and for other appropriate relief sufficient to compensate for the significant harm Defendants' PFAS chemicals and PFAS-containing products have caused.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:

#### Products Liability—Inadequate Design or Formulation—As Against All Defendants

156.    Plaintiff re-alleges and incorporates by reference each of the above paragraphs of this Complaint as if fully set forth herein.

157.    As described above, Plaintiff is a claimant and buyer for this product liability action as provided in N.C. Gen. Stat. §§ 99B-1 *et seq.* There is privity between Morris and Defendant Honeywell; however, to the extent there is no privity, Plaintiff brings this action directly against Defendants notwithstanding absence of privity under N.C. Gen. Stat. § 99B-2(b).

158.    All Defendants are merchants and sellers with respect to the turnout gear, Class B foams, and/or their PFAS-containing components, materials, and/or chemical feedstock as provided in N.C. Gen. Stat. §§ 99B-1 *et seq.*, in that Defendants were and are engaged, either themselves or through predecessors and/or subsidiaries in the business of designing, manufacturing, distributing, supplying, and/or selling PFAS-containing Class B foams, turnout gear, and/or their components, materials, and/or chemical feedstock.

159.    As designers, manufacturers, marketers, and sellers of PFAS and/or of Class B foam products and firefighter turnout gear containing PFAS, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses. Defendants owed that duty both to reasonably foreseeable users of their products and to any person or property that might reasonably be expected to come into contact with those products.

160.     Defendants knowingly placed PFAS and/or PFAS-containing turnout gear and/or Class B foam into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnout gear and/or Class B foam to fire departments for use by firefighters such as Morris, who are or were exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities, including training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

161.     Defendants intended that the PFAS and/or PFAS-containing turnout gear and/or Class B foam they were manufacturing, distributing, supplying, and/or selling would be used by firefighters, including Morris, without any substantial change in the condition of the products from when the products were initially designed, manufactured, distributed, supplied, and/or sold by Defendants.

162.     Defendants' PFAS-laden Class B foams and/or turnout gear or component PFAS chemicals used in the manufacture and/or design of Class B foams and/or turnout gear (collectively, "Products") were used in a reasonably foreseeable manner and without substantial change in the condition of such Products. These Products were defective and unfit for their reasonable use. Defendants knew or reasonably should have known that their manufacture, marketing, and/or sale, as well as their customers' transporting, storing, using, handling, training with, testing with, releasing, spilling, discharging, and/or disposing of Class B foam products and/or firefighter turnout gear in an intended or reasonably foreseeable manner, would foreseeably result in firefighter exposure to dangerous levels of PFAS.

163.     Morris was exposed to PFAS by using Defendants' PFAS-containing turnout gear and/or Class B foam during his firefighting activities, as described above, without knowledge of the turnout gear's and/or Class B foam's dangerous and hazardous properties.

164.    Defendants' Products were defective in design and unreasonably dangerous because, among other reasons:

a.  Defendants' Products were defective in design and formulation and, as a result, failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect;

b.  Defendants' Products were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate;

c.  Defendants' Products cause extensive and persistent PFAS contamination when used in a reasonably foreseeable and intended manner;

d.  Morris was exposed to these PFAS-containing products in the ways that Defendants intended them to be used and for the ordinary purposes for which these products were intended;

e.  Morris was exposed to these PFAS-containing products in ways that were foreseeable to Defendants.

165.    At all times relevant to this action, Defendants designed, manufactured, marketed, and sold PFAS-laden Products that were dangerous to an extent beyond that which would be contemplated by the ordinary consumer. Specifically, The turnout gear and/or Class B foam designed, manufactured, distributed, supplied, and/or sold by Defendants and used by Morris contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the turnout gear and/or Class B foam are defective in design and/or are unreasonably dangerous, unsuitable, and not safe for use by firefighters even when used as directed by the manufacturer and

for the intended purposes of firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

166.     At all times relevant to this action, the foreseeable risk to human health through use of Defendants' Products outweighed the cost to Defendants of reducing or eliminating such risk. Knowing of the dangerous and hazardous properties of turnout gear and Class B foam, Defendants could have designed, manufactured, distributed, supplied, and/or sold reasonable alternative designs or formulations of turnout gear and/or Class B foam that did not contain PFAS. Such alternative designs would have been safer for consumer-firefighters and would have reduced or prevented Morris' injury. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

167.     At all times relevant to this action, Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS in the manufacture and/or design of their Products, and the omission of such alternative designs rendered their Products not reasonably safe. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Morris that was caused by the Defendants' design, manufacture, distribution, supply, and/or sale of PFAS and PFAS-containing materials, including turnout gear and/or Class B foam.

168.     While Defendants have recently transitioned to short-chain PFAS-based Class B foams, which they claim are safer, they could have made this transition earlier. Moreover, Class B foams can be designed with fluorine-free compounds which do not contain or break down into PFAS at all.

169.     The unreasonably dangerous design defect in turnout gear and/or Class B foam containing PFAS exposed Morris to toxic levels of PFAS and therefore, was a proximate cause of Morris' injuries and damages as described herein.

170.    As a result of Defendants' design and formulation of a defective product, Defendants are liable in damages to Plaintiff.

171.    As a direct and proximate result of the foregoing acts and omissions, Morris suffered the injuries and damages described herein.

172.    Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein. Manufacturer Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

173.    Defendants have thus violated N.C.G.S. § 99B-1 *et. seq.*, including § 99B-6, and are liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief to which they are entitled.

174.    New DuPont and Corteva assumed Old DuPont's design defect liability described above.

### SECOND CAUSE OF ACTION:
### Products Liability—Inadequate Warning—As Against All Defendants

175.    Plaintiff re-alleges and incorporates by reference each of the above paragraphs of this Complaint as if fully set forth herein.

176.    As designers, manufacturers, marketers, and sellers of Products containing PFAS, Defendants had a duty to those who were at risk of being harmed by their Products to warn users of those of the foreseeable harms associated with them.

177.    Defendants knew or should have known of the substantial risk of harm to human health and the environment from their Products, but nevertheless failed to or inadequately warned of the toxic and persistent effects of exposure to such chemicals. Defendants failed to provide such warnings to users and buyers of their Products and/or to others to whom it was reasonably

foreseeable Defendants' Products would cause harm. To the extent Defendants provided any warnings about their products, they were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by their Products, and the warnings did not convey adequate information on the dangers of PFAS sufficient to inform a reasonably foreseeable or ordinary user or bystander.

178.     Despite the fact that Defendants knew or should have known about the risks their PFAS-laden Products posed to users and buyers, Defendants deliberately withheld such knowledge from them. Specifically, though Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, Defendants instead:

a. Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnout gear and/or Class B foam;

b. Did not have adequate instructions for safe use of the products;

c. Did not give warnings to persons, such as Plaintiff Morris or other firefighters, who had been, or reasonably may have been, exposed to Defendants' turnout gear and/or Class B foam, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects; and

d. Did not manufacture, market, promote, distribute, and/or sell reasonably comparable products not containing PFAS when it became feasible to do so.

179.    Moreover, Defendants affirmatively distorted and/or suppressed the information known to them and the scientific evidence linking their Products to the unreasonable dangers they pose.

180.    At no time relevant to this action did Defendants warn users and buyers of their Products and/or others whom it was reasonably foreseeable would be harmed by their Products that Defendants' PFAS-laden Products would, during the products' normal use, cause dangerous exposure to PFAS.

181.    Defendants' Products were in the same condition when they were purchased and/or used as they were when they left Defendants' control. Defendants' customers used the Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

182.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage of the kind that Plaintiff suffered. Specifically, Defendants knew that the use of turnout gear and/or Class B foam, even when used as instructed by Defendants, subjected firefighters such as Morris and others to a substantial risk of harm from PFAS or PFAS-containing materials, and yet, failed to adequately warn the Plaintiff Morris and other firefighters, the EPA, or the public.

183.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale and thereafter, Defendants could have provided warnings or instructions regarding the full and complete risks of turnout gear and/or Class B foam containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

184.    A reasonable person in Defendants' position and with Defendants' knowledge would have provided a warning as to the hazardous and toxic risks of PFAS to users of their PFAS-containing turnout gear and/or Class B foams.

185.    Defendants could have effectively communicated to users of the turnout gear and/or Class B foams including but not limited to by package, container and gear labels, training of users, and dissemination of information materials.

186.    At all times relevant to this action, Defendants' turnout gear and/or Class B foam did not contain an adequate warning or caution statement, which was necessary.

187.    Morris was unaware of the defective and unreasonably dangerous condition of Defendants' Products at a time when such Products were being used for the purposes for which they were intended, and Morris was exposed to PFAS released from the Defendants' turnout gear and/or Class B foam as a foreseeable result.

188.    Morris did not and could not have known that the use of turnout gear and/or Class B foam in the ordinary course of performing his duties as a firefighter could be hazardous to his health, bio-accumulate in his blood, and cause the cancer that led to his death.

189.    As a result of their inadequate warnings, Defendants' turnout gear and/or Class B foam were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by Morris.

190.    The lack of adequate and sufficient warnings was a substantial factor in causing the Plaintiff's harm and injuries, as described herein.

191.    As a result of Defendants' failure to provide adequate and sufficient warnings, Defendants are liable for damages to Plaintiff.

192.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered the injuries and damages described herein.

193.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. Specifically, Defendants acted with willful or conscious disregard for the rights, health, and safety of the Plaintiff Morris, as described herein, thereby entitling the Estate of Morris to an award of punitive damages.

194.    Defendants have thus violated N.C.G.S. § 99B-l et. seq., including § 99B-5, and are liable for all such damages.

195.    New DuPont and Corteva assumed Old DuPont's failure to warn liability described above.

### THIRD CAUSE OF ACTION:
### Negligence—As Against All Defendants

196.    Plaintiff re-alleges and incorporate by reference each of the above paragraphs of this Complaint as if fully set forth herein.

197.    Defendants owed a duty of reasonable care toward Morris that was commensurate with the inherently dangerous, harmful, injurious, persistent, toxic, and bioaccumulative nature of Class B foam and turnout gear containing PFAS, including a duty to ensure the PFAS did not infiltrate, persist in, or accumulate in the blood or body of Morris.

198.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of their Products into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or bodies of firefighters like Morris and including a duty to assure their Products

would not cause users to suffer unreasonable, dangerous side effects to immediate users or foreseeable bystanders.

199.    Defendants had a duty to exercise reasonable care to ensure that their Products were manufactured, marketed, and sold in such a way as to ensure that the end users of the Products were aware of the potential harm PFAS can cause to human health, and were advised to use the Products in such a way that would not be hazardous to their health.

200.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the Class B foam and/or turnout gear. However, Defendants knowingly and intentionally failed to do so.

201.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their Products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing materials in their Products were hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

202.    Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS-laden Products was hazardous to human health, and that the PFAS contained in the Products bioaccumulated in the blood and caused serious health effects, including cancer.

203.    Defendants negligently and deceptively underreported, underestimated, and intentionally downplayed the serious health dangers of the PFAS contained in their Products.

204.    Defendants negligently, carelessly, and recklessly recommended application and disposal techniques for PFAS and/or for their Products containing PFAS that directly and proximately caused harm to Morris.

205.    Defendants knew or should have known that firefighters such as Morris working with and using their Products would be exposed to PFAS.

206.    At all times relevant to this action, Morris inhaled, ingested, and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' Class B foam and/or turnout gear.

207.    Morris' exposure to Defendants' turnout gear and Class B foam, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing products, was harmful and substantially increased the risk of injuries to Morris and did cause injuries to Morris.

208.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling Class B foam and/or turnout gear containing PFAS or PFAS-containing materials would result in harm to firefighters such as Morris as a result of his using turnout gear or Class B foam in the ordinary course of performing his duties.

209.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnout gear and Class B foam, and/or Defendants' other acts and/or omissions as described in this complaint could likely result in PFAS exposure to firefighters such as Morris, the persistence and accumulation of toxic and harmful PFAS in his blood and body, and cause injuries to firefighters such as Morris as herein alleged.

210.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to Morris, the persistence and accumulation of toxic and harmful PFAS in his blood and body, and caused injuries to Morris as herein alleged.

211.    Defendants, through their acts and/or omissions as described in this Complaint, breached their duties to Morris.

212.    It was reasonably foreseeable to Defendants that firefighters, including Morris, would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

213.    As a direct and proximate result of the foregoing acts and omissions, Morris suffered the injuries described herein, which are permanent and lasting in nature, including physical pain, mental anguish, and death. But for Defendants' negligent acts and/or omissions, Morris would not have been injured or harmed.

214.    As a direct and proximate result of the Defendants' negligence as described above and as may further be proven at trial, Chris Morris, as Administrator of the Estate of Frank Wilford Morris, Jr., is entitled, under N.C. Gen. Stat. §28A-18-2, to recover the following damages to be proved through discovery and at trial:

    a.  Compensation for any pain and suffering endured by Morris;

    b.  Expenses for care, treatment and hospitalization incident to the injury resulting in death;

    c.  The reasonable funeral and burial expenses of Morris;

    d.  Lost net income of Morris;

e.  Services, protection, care, and assistance of Morris; and

f.  Society, companionship, comfort, guidance, kindly offices and advice of Frank Morris.

215.    Plaintiff Chris Morris, as Administrator of the Estate of Frank Wilford Morris, Jr., is entitled to recover compensatory damages from the Defendants in an amount in excess of $75,000.

216.    Furthermore, Defendants acted with willful or conscious disregard for the rights, health, and safety of Morris, as described herein, thereby entitling the Estate of Frank Wilford Morris, Jr. to an award of punitive damages.

## FOURTH CAUSE OF ACTION:
## Unfair and Deceptive Trade Practices—As Against All Defendants

217.    Plaintiff re-alleges and incorporates by reference each of the above paragraphs of this Complaint as if fully set forth herein.

218.    N.C. Gen. Stat. § 75-1.1 makes unlawful, "Unfair method of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

219.    Defendants are engaged in practices affecting commerce by manufacturing and selling PFAS-containing firefighter turnout gear and Class B foam.

220.    Defendants have committed unfair and deceptive acts and practices in violation of N.C. Gen. Stat. § 75-1.1 and regulations promulgated thereunder. These violations include, but are not limited to the manufacturing, selling, and/or distributing of PFAS chemicals, PFAS-containing products or materials, including Class B foam and/or turnout gear in a defective condition that is and was unreasonably dangerous to users, including Morris, because such PFAS chemicals or PFAS-containing materials are toxic and unreasonably dangerous to human health and the environment, and there were safer reasonable alternative designs available.

221.    Defendants' continuous and ongoing public deception, as described above, is and was intended to deceive, confuse, and/or mislead users, including Morris, as to the dangers of PFAS and/or PFAS-containing materials and products, including Class B foam and/or turnout gear. Such misleading statements and representations were made to increase Defendants' profits and without regard for the health and safety of users, including Morris.

222.    As a proximate result of Defendants' unfair and deceptive trade practices, Morris developed serious diseases, including cancer, and Plaintiff is entitled to recover the damages sought in this Complaint.

223.    Additionally, pursuant to N.G. Gen. Stat. §75-16 and §75-16.1, Plaintiff is entitled to recover treble damages and attorneys fees relating to damages for injuries sustained and costs incurred by Morris arising out of Defendants' unfair and deceptive trade practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court for relief as follows:

(1)    They recover a judgment in favor of Plaintiff and against Defendants, jointly and severally, of compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount according to proof at time of trial;

(2)    They recover a judgment in favor of Plaintiff and against Defendants, jointly and severally, of economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

(3)    They recover a judgment in favor of Plaintiff and against Defendants, jointly and severally, of punitive and/or treble damages for the wanton, willful, deceptive,

fraudulent, and/or reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of the Plaintiff in particular, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

(4)    Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

(5)    They are awarded costs and expenses of this action, including reasonable attorney's fees, to be taxed against Defendants;

(6)    Equitable and injunctive relief, as necessary, to ensure that Defendants refrain from continuing harm to others;

(7)    A trial by jury on all issues so triable; and

(8)    Such other and further relief as this Court may deem just and proper.

This the 16th day of November 2022.

By: _____ /s/F. Bryan Brice, Jr. _____
       F. Bryan Brice, Jr.
       bryan@attybryanbrice.com
       N.C. State Bar No. 17840
       Catherine Cralle Jones
       cathy@attybryanbrice.com
       NC State Bar No.: 23733
       Law Offices of F. Bryan Brice, Jr.
       127 W. Hargett Street, Suite 600
       Raleigh, NC 27601
       Telephone: (919) 754-1600
       Facsimile: (919) 573-4252
       *Attorneys for Plaintiff*